IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 28, 2007**

Charles R. Fulbruge III
Clerk

No. 05-50983

VALERIE L. CORRY

Plaintiff-Appellee

v.

LIBERTY LIFE ASSURANCE COMPANY OF BOSTON

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas

Before JOLLY, PRADO, and OWEN, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal requires us to determine whether a long-term disability plan administrator, Liberty Life Assurance Company of Boston ("Liberty"), abused its discretion by terminating disability benefits to Valerie L. Corry ("Corry"), whose claim for disability arises from fibromyalgia. The primary focus of the appeal is the district court's holding that Liberty's decision to terminate benefits was arbitrary and capricious because it discounted and ignored Corry's subjective claims of pain and disability. We conclude that Liberty, and its physicians, considered Corry's subjective claims of pain and disability and thus Liberty did not abuse its discretion in failing to consider relevant evidence. Furthermore, we conclude that Liberty's decision denying benefits is supported by substantial

evidence, which includes the opinions of three medical specialists stating that there is no verifiable medical evidence that would preclude Corry from performing full-time sedentary work. We therefore REVERSE, RENDER, and REMAND for entry of judgment in favor of Liberty.

I.

In 1991, Corry began working for Dell Computer Corporation as a "Sales Manager IV." According to her job description, Corry was "[r]esponsible for managing the internal sales force selling to large complex customers within a limited geographic region and within a specific market." As listed in her job description, her principal duties included managing a business unit, attaining sales goals, analyzing sales reports, working with other departments to resolve customer concerns, and participating in and closing large sales opportunities. Her job description states that her job required strong organization, communication, and presentation skills. Corry was a participant and beneficiary of a Group Disability Income Policy ("Policy") administered by Liberty.

Sometime in 1995, Corry became ill. In August 1995, Corry took a medical leave of absence on the advice of her treating family care physician, Dr. Robert Norris. In December 1995, she applied for long-term disability benefits, which Liberty approved and began paying in April 1996. Under the Policy, Corry also received retroactive benefits back to November 3, 1995. Additionally, Corry applied for Social Security disability benefits, which were granted.

A complete diagnosis of the cause of Corry's disability has never been clear. The parties agree that Corry suffers from a seizure disorder, fibromyalgia,[1] and a rotator cuff sprain in her shoulder. The parties disagree,

---

[1] Betty Todd, a registered nurse and witness for Liberty, stated in her affidavit, which is not in dispute, that fibromyalgia is a rheumatic syndrome that causes pain in the muscles, tendons, and fibrous and other connective tissues. The National Institutes of Health state that a person suffering from fibromyalgia may experience trouble sleeping, morning stiffness, headaches, painful menstrual periods, tingling or numbness in hands and feet, and problems with thinking and memory. The causes of fibromyalgia are unknown. Nat'l Institutes of

however, as to whether her pain could also be attributed to Chronic Fatigue Syndrome,[2] lupus,[3] Sjogren's Syndrome,[4] undifferentiated[5] or mixed connective tissue disease,[6] or some other rheumatic or musculoskeletal disorder. (The accompanying footnotes provide information not necessarily found in the record and are supplied only to inform the reader generally of terms reflected in the medical records in this case. None of these definitions are determinative of the outcome of this case.)

---

Health, "What Is Fibromyalgia? Fast Facts: An Easy-to-Read Series of Publications for the Public," March 2005 available at http://www.niams.nih.gov/hi/topics/fibromyalgia/FF_Fibromyalgia.pdf.

[2] Chronic Fatigue Syndrome is a disorder causing profound fatigue that is not improved by rest and that may be worsened by physical or mental activity. A person suffering from Chronic Fatigue Syndrome may experience muscle pain, headaches, sore throat, tender lymph nodes, multi-joint pain, problems with concentration or memory, and post-exertional fatigue lasting more than twenty-four hours. The causes are unknown. Chronic Fatigue Syndrome is diagnosed on the basis of self-reported symptoms. U.S. Dep't of Health and Human Services, Centers for Disease Control and Prevention, "Chronic Fatigue Syndrome," Sept. 2006, available at http://www.cdc.gov/cfs/pdf/06_103087_dtp_cfs_booklet-spread.pdf.

[3] Lupus is a disorder in which a person's immune system attacks healthy cells and tissues. Lupus exists in various forms, and its symptoms widely vary. The cause of lupus is unknown. Nat'l Institutes of Health, "What Is Lupus? Fast Facts: An Easy-to-Read Series of Publications for the Public," Sept. 2005, available at http://www.niams.nih.gov/hi/topics/lupus/FF_Lupus.pdf.

[4] Sjogren's Syndrome is a disorder in which a person's immune system attacks glands that produce tears and saliva. The main symptoms are dry eyes and dry mouth. The exact cause is unknown. Nat'l Institutes of Health, "What Is Sjögren's Syndrome? Fast Facts: An Easy-to-Read Series of Publications for the Public," Sept. 2005, available at http://www.niams.nih.gov/hi/topics/sjogrens/FF_Sjogrens.pdf.

[5] Undifferentiated connective tissue disease is a term used to refer to persons who appear to have a connective tissue disease such as lupus or rheumatoid arthritis but whose specific diagnosis is not obvious. See Kelley's Textbook of Rheumatology 1258 (Edward D. Harris, Jr. et al. eds., 2005).

[6] Mixed connective tissue disease has many of the characteristics of several other diseases including lupus and rheumatoid arthritis. "The origin or cause of the disease is unknown, and it has not been determined if this is a distinct disease or a conglomeration, but the prevailing opinion is that it is a clinical entity and that the immunity system plays a major role." 4 J.E. Schmidt, Attorney's Dictionary of Medicine and Word Finder M-234 (2001).

Liberty initially approved disability benefits for Corry. Under the Policy, a person is considered disabled during the initial 36 months of benefits if "the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness." After the initial 36 months, a person continues to receive benefits only if "the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity." Additionally, the Policy provides that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder."

From 1996 to 2001, Corry received benefits from Liberty while she sought medical treatment. Corry continued to be treated by Dr. Norris. Corry also sought evaluation by Dr. Michael Pickrell, a rheumatologist recommended by Dr. Norris. In February 1996, Dr. Michael Pickrell's impressions of Corry included "[n]onspecific symptoms of fatigue, recurrent rashes, vague musculoskeletal pain - all possibly related to systemic rheumatic disorder."

In July 1996, Corry was evaluated by Dr. Carlos Gray, a physician retained by Liberty. Dr. Gray concluded that "based on her medical history I feel Mrs. Corry has chronic fatigue syndrome which is an analysis by exclusion." Dr. Gray evaluated Corry's physical capabilities, concluding that during an eight-hour workday, Corry could sit two hours, stand one hour, and walk one hour. He also concluded that she could lift and carry up to ten pounds frequently, use her hands for grasping and fine manipulation but not pushing or pulling, reach above shoulder level frequently, and bend frequently. He concluded that she could not squat, crawl, or climb. Ultimately, Dr. Gray concluded that he did not feel that Corry could return to her normal job.

In September 1997, Corry visited Dr. Jeffrey Clark, a neurologist at Scott and White Neurology Clinic. Corry reported seizures since childhood, which Dr. Clark noted were controlled "quite well" by Dilantin. Dr. Clark also noted that Corry complained of headaches and joint pain. Dr. Clark reported: "Mrs. Corry is a neatly-dressed, very pleasant and talkative woman who looks her stated age [38]. She provides very detailed information about all of her history, including a long list of symptoms and correct dates without any problem." He further reported: "Mental status exam reveals normal orientation, recent memory, and short-term memory for 3 objects. Again, she provides very detailed information as listed above. . . . She interpret [sic] abstract phrases well. Language and speech are normal. General information is good. Judgement seemed normal."

In November 1997, Corry sought evaluation by Dr. Michael Pickrell's brother, Dr. Paul Pickrell, also a rheumatologist. Dr. Paul Pickrell concluded that Corry suffered from "[c]hronic arthralgias and myalgias, [and] fatigue." He added: "Given the number of tender points on exam in association with headaches, fatigue, irritable bowel symptoms, and stress, I feel she does meet criteria for fibromyalgia." He also noted: "I reassured both her and her husband that, from an exam standpoint, she does not meet criteria for any specific rheumatologic disorder at this time. I do, however, feel that a diagnosis of undifferentiated connective tissue disease could be made on the basis of her subjective symptoms and positive ANA."[7] Dr. Paul Pickrell continued to treat Corry throughout the following years.

In March 1998 and August 1998, Liberty notified Corry that the Policy's definition of "disability" would change on November 3, 1998, the end of the

---

[7] ANA is the abbreviation for "antinuclear antibody." STEDMAN'S MEDICAL DICTIONARY 66 (27th ed. 2000). ANA is found in "a high proportion of patients with systemic lupus erythematosus, rheumatoid arthritis, and certain collagen diseases, in some of their healthy relatives; also in about 1% of normal individuals." Id. at 97.

initial 36-month period, and that her case would be reevaluated to determine whether she met the heightened standard of disability.

In February 1999, Corry was admitted to the emergency room at South Austin Hospital. Corry complained of pain across her chest whenever she took a deep breath or coughed. The attending physician, Dr. Michael McElveen, concluded that she likely suffered from an acute flare of lupus.

As Liberty began to reevaluate Corry's case, it sent Dr. Norris a questionnaire dated March 30, 1999. In response, on April 30, Dr. Norris provided Liberty with an evaluation of Corry in which he reported that her primary diagnosis was a mixed connective tissue disorder and a seizure disorder and that her symptoms included severe fatigue, confusion, malaise, depression, and weakness. In response to questions about when he expected Corry to return to modified function or full function, he noted "n/a." Dr. Norris evaluated Corry's physical capabilities and concluded that she would be capable of the following activities in an eight-hour workday: sitting 100%, lifting 0%, walking 10%, standing 10%, carrying 0%, driving 10%, traveling 0%, and typing 10%. He stated that she could rarely reach, bend, kneel, climb, squat, or twist. Dr. Norris indicated that Corry had a medium degree of manual dexterity and that her lifting ability was 10 pounds or less.

In February 2000, Liberty retained Dr. Walter Chase, a rheumatologist, to examine Corry and evaluate her medical file. In his report, Dr. Chase observed that Corry was "unsteady on [the] tandem walk." Dr. Chase noted, apparently based on Corry's comments, that she experienced pain throughout much of her body, numbness in her feet, dizziness, pleurisy, headaches, and shortness of breath. Dr. Chase also noted that Corry could not perform a long list of basic activities, apparently based on the information she self-reported. For example, according to Corry, she was unable to do her grocery shopping or to go out for more than one and a half hours. Corry also reported that she

6

needed assistance with her shower and much of her daily care. She found it difficult to comb her hair, open doors, cut meat, climb a flight of stairs, and turn a lock. Apparently she was unable to lift a full coffee pot. She was able to do some paperwork in the mornings, when she was at maximum mental sharpness. Dr. Chase concluded that Corry met the criteria for fibromyalgia but that "[n]o objective evidence was uncovered during this examination or review of records that would result in a finding of total disability." He also concluded that Corry never displayed "any typical organ system manifestations" of lupus. He recommended a functional capacity evaluation to determine Corry's capacity for limited work.

Within weeks of Dr. Chase's evaluation, Liberty scheduled a functional capacity examination for Corry to take place on March 7, 2000. The functional capacity examination would last "most of the day." Following advice of Dr. Norris that "an extended examination" might cause a flare-up of her symptoms, Corry decided not to undergo the functional capacity examination.

In November 2000, as Liberty continued to review Corry's eligibility for benefits, Liberty sent Dr. Norris an additional questionnaire. In his response, Dr. Norris indicated that Corry's disabling condition was "mixed connective tissue disorder." In response to a question asking "[w]hat objective testing/findings confirm Ms. Corry is incapable of resuming employment in a full time sedentary duty capacity," Dr. Norris stated, "rheumatic profile, evaluation by multiple rheumatologists." As to when Corry could resume full-time sedentary work, Dr. Norris stated: "Prognosis unknown."

In January 2001, Corry was again admitted to the emergency room, where she complained of several days of sharp pain in her abdomen. Upon extensive evaluation, Dr. David Habenicht diagnosed her with nonspecific abdominal pain. Thereafter, Dr. Norris referred Corry to Dr. Jeffrey Meynig, who concluded that

Corry's abdominal pain did not likely come from "an intraabdominal source of pain" but instead appeared to be musculoskeletal.

In February 2001, Dr. Paul Pickrell examined Corry and indicated that she continued to suffer from musculoskeletal lupus and Sjogren's Syndrome.

In April 2001, Liberty retained Dr. Gail Brown, who specializes in physical medicine and rehabilitation, to evaluate Corry's file. Dr. Brown concluded that Corry suffered from various conditions including a seizure disorder, fibromyalgia, and a history of chronic fatigue, but that past findings of mixed connective tissue disorder were not verified by the medical evidence. Dr. Brown noted "a paucity of medical documentation confirming this claimant's alleged illnesses." Dr. Brown concluded: "The claimant's reported total disability is not substantiated by the objective medical documentation. ... Based on the objective medical documentation related to the claimant's non-psychiatric conditions, I find no basis to preclude this claimant from performing sedentary work." Dr. Brown recommended that Corry undergo a functional capacity examination.

In May 2001, Liberty scheduled Corry for an independent neuropsychological examination to take place June 14. Corry was informed that the exam would take seven to eight hours. Corry did not attend the exam. Liberty then suspended Corry's benefits, scheduled a new exam for July 10, and told her that her failure to attend the new exam would result in complete termination of her benefits.

In response, Corry's attorney told Liberty that Corry would not attend the rescheduled exam, as Dr. Norris and Dr. Paul Pickrell had advised her that the exam could result in a "flare" of her condition. Corry's attorney also stated that the supervising physician in such an exam should be a rheumatologist and not

a neuro-psychiatrist, but that, regardless, Corry would not attend the rescheduled exam.[8]

On the basis of Corry's refusal to attend the examinations, Liberty notified Corry on July 13, 2001 that it was terminating her benefits. Corry appealed Liberty's decision.

Corry had also turned to litigation. In April 2001, Corry had filed a complaint in Texas state court against Dell and Liberty. Corry alleged Texas Labor Code violations, contract claims, and other theories of recovery related to Corry's alleged entitlement to benefits under the Policy. Dell and Liberty removed the case to the Federal District Court for the Western District of Texas. On August 27, 2001, the district court granted Dell's motion for summary judgment, and on November 14, 2001, the district court granted Liberty's motion to dismiss, concluding that Corry's state claims were preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"). The district court dismissed any ERISA-based claims without prejudice for failure to exhaust administrative remedies.

Meanwhile, Liberty began to review Corry's appeal of its decision to terminate her benefits. During its review, Liberty received a letter dated August 2, 2001 from Dr. Paul Pickrell describing Corry's ailments. According to Dr. Pickrell, Corry's ailments caused her "constant muscle pain, fatigue, headaches and joint pain." He wrote: "She remains on disability and I feel that given her current condition, she would be unable to return to any type of gainful employment."

Over the next several months, Liberty continued to review Corry's eligibility, retaining rheumatologist Dr. Andrew Porges to examine Corry's file "to determine Ms. Corry's level of functionality." Although Dr. Porges did not

---

[8] Liberty neither accepted nor denied Corry's request for a rheumatologist to attend the exam.

actually examine Corry, he reviewed medical records of her treating and evaluating physicians. Dr. Porges concluded that the objective and clinical findings in Corry's file did not support a diagnosis of mixed connective tissue disease, lupus, Sjogrens, or a significant musculoskeletal disorder, aside from an impingement of the right shoulder. Dr. Porges also concluded that Corry did not suffer from Chronic Fatigue Syndrome but that she did suffer from fibromyalgia. In response to Liberty's question as to whether there was "any documentation of a significant musculoskeletal disorder that would prevent her form [sic] performing a sedentary job," Dr. Porges said she had an impingement in her right shoulder that would not prevent full-time sedentary employment. Aside from the shoulder impingement, according to Dr. Porges, "[n]o other objective evidence of a significant musculoskeletal disorder has been provided, aside from Ms. Corry's subjective complaints of chronic, diffuse pain."

Based on the medical records before him, Dr. Porges estimated Corry's functional capabilities. Dr. Porges concluded that, on a continual basis, Corry could sit for 2 hours, stand for 30 minutes, or walk for 30 minutes. He also concluded that during a typical eight-hour workday, assuming Corry could change positions, she was capable of sitting for 8 hours, standing for 1 hour, and walking for 1 hour. Similarly, in an eight-hour workday, she likely could reach forward less than 18 inches frequently (i.e., 33% to 66% of the time); she could reach forward more than 18 inches occasionally (i.e., 0% to 33% of the time); she could climb occasionally; and she could never stoop, kneel, balance, crouch, crawl, drive, reach above her shoulders, or work in high places. By Dr. Porges' estimations, Corry could lift and carry 10 pounds. He also concluded that she could handle, grasp, finger, feel, push, and pull without restriction.

Liberty also commissioned two labor market surveys. The first survey evaluated employment opportunities in Austin, Texas for sales manager and similar positions requiring only sedentary work. The survey concluded that all

such available positions required traveling, from which Corry was restricted, and therefore no suitable positions existed for Corry in Austin. The second survey covered the entire United States and considered the positions of customer service manager, telemarketing manager, and sales manager, finding seven full-time positions for which Corry would be qualified and for which traveling was not required.

On March 11, 2002, Liberty issued a final denial letter affirming its initial termination of Corry's benefits. In its letter, however, Liberty did not base its March 11 decision on Corry's refusal to submit to examinations, as it did when it initially denied benefits. Instead, Liberty stated that Corry was not "disabled" as defined in the Policy language. Liberty asserted that it had "conducted a full and fair review of Ms. Corry's appeal and all accompanying materials." Liberty told Corry she could not appeal Liberty's March 11 decision.

Approximately seven months later, on October 30, 2002, Corry mailed Liberty her own affidavit along with the affidavits of her two physicians, Dr. Norris and Dr. Paul Pickrell. In their affidavits, the physicians both reaffirmed their prior conclusions that Corry was disabled and unable to perform sedentary work in a work environment. Liberty alleges that its appeals review consultant, Chuck Johnson, never received the affidavits because Corry failed to list his name on the mailing envelope. The evidence indicates that although Corry did omit Johnson's name from the envelope, she properly addressed the envelope to the return address Liberty provided in its benefits denial letter. Additionally, Corry submitted a cover letter with the affidavits. It is undisputed that the cover letter clearly stated: "Attention: Mr. Chuck Johnson, Appeals Review Consultant."

## II.

This lawsuit followed. On January 15, 2004, Corry filed her complaint in federal district court. The parties conducted discovery and moved for summary

11

judgment. Additionally, Liberty moved to strike from the evidence the three affidavits Corry had submitted to Liberty on October 30, 2002.

On June 1, 2005, the district court entered final judgment. As to Liberty's motion for summary judgment, the district court denied it in part and granted it in part. Additionally, the district court denied Liberty's motion to strike the affidavits. The district court granted Corry's motion for summary judgment on the basis of 29 U.S.C. § 1132(a)(1)(B) of ERISA,[9] holding that Liberty's decision to terminate Corry's benefits was an abuse of discretion for failure to consider Corry's subjective complaints of pain and disability. Because the district court granted Corry full relief under 29 U.S.C. § 1132(a)(1)(B) of ERISA, it dismissed her claims for any additional relief under 29 U.S.C. § 1132(a)(3) and 29 C.F.R. § 2560.503-1(h).[10] The district court ordered that Corry was entitled to benefits that she should have been paid from June 15, 2001 through June 1, 2005 plus prejudgment interest, the reinstatement of her benefits effective June 1, 2005, and reasonable attorney's fees. Liberty appealed.

III.

This Court reviews summary judgments de novo in ERISA cases, applying the same standards as the district court. See Baker v. Metropolitan Life Ins. Co., 364 F.3d 624, 627-28 (5th Cir. 2004). We review an administrator's denial of ERISA benefits for abuse of discretion if "an administrator has discretionary

---

[9] That provision states, in relevant part: "A civil action may be brought-- (1) by a participant or beneficiary-- ... to recover benefits due to him under the terms of his plan ..." 29 U.S.C. § 1132(a)(1)(B) (2006).

[10] Under 29 U.S.C. § 1132(a)(3) ,"[a] civil action may be brought-- ... (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]" 29 U.S.C. § 1132(a)(3) (2006). Under 29 C.F.R. § 2560.503-1(h), a plan administrator must provide a claimant with a "full and fair review." See 29 C.F.R. § 2560.503-1(h). Corry did not appeal the district court's dismissal of her claims for relief under 29 U.S.C. § 1132(a)(3) and 29 C.F.R. § 2560.503-1(h).

authority with respect to the decision at issue." Vega v. Nat'l Life Ins. Serv., Inc., 188 F.3d 287, 295 (5th Cir. 1999) (en banc). Here, Liberty had discretionary authority to determine eligibility for benefits and to construe the terms of the plan. Therefore, we review Liberty's decisions for abuse of discretion. See id.

Under the abuse of discretion standard, "[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." Ellis v. Liberty Life Assurance Co. of Boston, 394 F.3d 262, 273 (5th Cir. 2004). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quotation omitted). "An arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence." Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich., 97 F.3d 822, 828 (5th Cir. 1996).

Where, as here, the administrator is self-interested because it both insures and administers the plan, we apply a "sliding scale standard" and accord Liberty's decision less than full deference. Vega, 188 F.3d at 295-97. "The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be." Id. at 297. Here, although Liberty's dual role as administrator and insurer provides a minimal basis for a potential conflict of interest, see Lain v. UNUM Life Ins. Co. of Am., 279 F.3d 337, 343 (5th Cir. 2002), Corry presented no further evidence with respect to the degree that the conflict exists and affects Liberty's decision in this case. Accordingly, we review Liberty's decision "with only a modicum less deference than we otherwise would." See Vega, 188 F.3d at 301; see also Lain, 279 F.3d at 343.[11] Ultimately, "our review of the administrator's decision need not be

_____

[11] We can find no indication that Liberty's potential conflict of interest adversely affected Liberty's handling of Corry's claim. Liberty's review of Corry's claim for over two and a half years, beginning in November 1998, demonstrated a careful investigation. Furthermore,

particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness -- even if on the low end." Vega, 188 F.3d at 297.

IV.

To determine whether Liberty abused its discretion, we begin by reviewing the decision of the district court. The district court held that Liberty's decision to terminate Corry's benefits was arbitrary and capricious because Corry's undisputed illness of fibromyalgia is characterized by subjective symptoms, yet Liberty "discounted Corry's subjective reporting of disabling pain and fatigue ... in favor of the 'the [sic] totality of clinical and objective findings'" and "cherry-picked those conclusions that were grounded in objective medical criteria and completely ignored the significance of the subjective manifestations of Corry's illness." According to the district court, "Liberty apparently refused to accord any weight to the subjective evidence of Corry's illness and instead relied solely on objective medical findings." The district court found that "no physician who properly accounted for both the objective and subjective evidence of Corry's limitations concluded that Corry is able to perform full-time sedentary work." Furthermore, the district court emphasized the disparity between the medical opinions of Liberty's consulting physicians and the medical opinions of Corry's treating physicians, Dr. Norris and Dr. Paul Pickrell, who have repeatedly asserted in letters and affidavits[12] that Corry is unable to return to work. The

Liberty engaged three specialists to examine Corry's claim, and the opinions of these specialists are clear and unequivocal. Accordingly, when we apply the applicable standard of review, we do not find it doubtful but that Liberty's decision is supported by substantial evidence. See Ellis, 394 F.3d at 273.

[12] Contrary to Liberty's arguments, the district court did not abuse its discretion in admitting the affidavits of Corry, Dr. Norris, and Dr. Paul Pickering; the district court correctly concluded that the affidavits were part of the administrative record. Corry properly submitted the affidavits to Liberty on October 30, 2002, and the affidavits were timely. Under Vega, "the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a

14

district court concluded that by focusing on "purely objective criteria," Liberty abused its discretion.

Liberty disputes these conclusions of the district court. According to Liberty, it and its consulting physicians considered all of the evidence, both subjective and objective. Liberty argues that it was entitled to rely upon the medical opinions of its three consulting physicians, who concluded that no objective evidence supported a finding of disability. Corry defends each letter of the district court's decision.

Thus the district court's opinion and the arguments of the parties frame the issues presented for our resolution. The first and more salient question presented is whether Liberty's evaluation and consideration of Corry's claim was arbitrary and capricious for failing properly to consider relevant evidence, that is, Corry's subjective evidence of pain and disability. If Liberty's consideration of Corry's evidence was not arbitrary and capricious, the second question to resolve is whether, in the light of all the evidence, there is substantial evidence to support Liberty's determination that Corry can perform full-time sedentary work. See Ellis, 394 F.3d at 273.[13]

---

fair opportunity to consider it." 188 F.3d at 300. Here, Corry's affidavits are within the administrative record because she submitted them over a year before she filed this lawsuit on January 15, 2004, thereby giving Liberty "fair opportunity" to consider them. See id. Therefore, the district court did not abuse its discretion by admitting the affidavits. See Celestine v. Petroleos de Venezuela SA, 266 F.3d 343, 349 (5th Cir. 2001) ("This Court reviews the evidentiary rulings of the district court only for abuse of discretion.").

[13] The second question, as framed, is based on Liberty's letter dated March 11, 2002 affirming its denial of benefits on the grounds that Corry's illnesses did not "prevent her from performing the material and substantial duties of her occupation or other sedentary-type occupations for which she is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity" (emphasis added). Liberty initially denied Corry's benefits, by letter dated July 13, 2001, on grounds that Corry failed to submit to cause-specific medical exams. As a reviewing court, however, we only review the administrator's final decision terminating the claimant's benefits.

V.

A.

With respect to Corry's claim of pain and disability, the record leaves no doubt that, indeed, the evidence supporting her claims is based largely on her self-described symptoms, which no one suggests are pretended. It is also true that Liberty and its physicians focused on the absence of objectively verifiable medical evidence of Corry's disability, as indicated by Liberty's final denial letter and the reports of Liberty's three consulting physicians, Dr. Chase, Dr. Brown, and Dr. Porges. Furthermore, we agree with the district court that all three consulting physicians expressed their conclusions that Corry was not disabled on grounds that her claimed disability was not medically verifiable, without offering an opinion on whether Corry's self-reported symptoms rendered her disabled.

Nevertheless, the record shows that Liberty considered Corry's subjective complaints in finding her not disabled. Importantly, Liberty specifically referred to Corry's subjective complaints in its final denial letter. For example, Liberty noted Dr. Norris's 1995 diagnosis of chest pain and fatigue. Similarly, Liberty reported that when Corry visited Dr. Michael Pickrell in February 1996, "Ms. Corry reported concern with a variety of symptoms, including recurrent left-sided chest discomfort, recurrent rashes, recurrent right knee discomfort." Liberty also noted an office note by Dr. Norris, dated September 8, 1998, which stated: "Overall, doing better. Feels like Plaquenil is helping her[.] Still fatigued quite easily." Liberty noted physicians' outpatient notes from Scott and White Neurology Clinic, which mentioned Corry's headaches. Liberty summarized October 2001 office notes of another physician, Dr. Gupta, to include "Migraine headaches under excellent control" and "myofascial pain syndrome under excellent control with continued exercise." Liberty referenced Dr. Brown's report: "Moreover, neither Dr. Skaggs nor Dr. Hill of neurology were

able to explain this claimant's neurological symptoms." Finally, Liberty cited extensively from Dr. Porges's report. There, Liberty asked Dr. Porges whether, among other matters, Corry met "the criteria" for fibromyalgia, an inherently subjective inquiry. See Wolfe, et al., "The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia. Report of the Multicenter Criteria Committee," 33 Arthritis & Rheumatism 160-72 (1990). Thus, although it is certainly true that Liberty's references to Corry's subjective complaints were less prominent than Liberty's emphasis on the lack of objective medical evidence of a disability, it is clear that Liberty's analysis considered Corry's subjective complaints of disability. Furthermore, Liberty accepted Corry's diagnosis of fibromyalgia without requiring objective evidence to establish the malady.

It is further evident from Liberty's final denial letter that Liberty's consulting physicians considered Corry's subjective evidence, a fact reinforced by the physicians' individual reports. For example, all three consulting physicians agreed that Corry suffered from fibromyalgia, and to reach this conclusion, the physicians would have had to consider subjective evidence of pain. See id. Dr. Chase listed Corry's subjective complaints in great detail and explained that Corry found it difficult to perform a wide variety of tasks including combing her hair, opening doors, cutting meat, climbing a flight of stairs, and turning a lock. Likewise, Dr. Brown considered Corry's subjective complaints:

> The claimant has had complaints of wide spread myofascial pain dating back several years. She was assessed with clinical fibromyalgia only recently by Dr. Chase. Fibromyalgia would explain this claimant's wide spread musculoskeletal tenderness. However, there is no evidence for musculoskeletal impairment or joint abnormalities (except for the claimant's right shoulder condition) related to this claimant's myofascial pain complaints and fibromyalgia.
>
> ***

17

> The claimant has had symptoms of fatigue dating back to 1995, initially related to increased stress from her job. She subsequently was labeled with chronic fatigue syndrome. However, this claimant has other reasons for fatigue, including recurrent sinusitis, depression, mild anemia and observed deconditioning. Chronic fatigue syndrome is a diagnosis of exclusion, and one cannot make the diagnosis of chronic fatigue syndrome in the presence of other causes of fatigue.

Additionally, Dr. Porges considered Corry's subjective complaints:

> From a rheumatology perspective, Ms. Corry's primary diagnosis affecting her ability to function is fibromyalgia. Ms. Corry has a mild impairment in musculoskeletal function due to fibromyalgia and rotator cuff sprain. She has had multiple musculoskeletal symptoms for many years. Records do not indicate a significant change in her complaints. Ms. Corry was noted by Dr. Pickrell, in an 04/11/01 office note, to have complaints of costochondritis. She was noted to have started trying to exercise as treatment for her fibromyalgia. Ms. Corry's records show the typical waxing and waning of musculoskeletal complaints associated with fibromyalgia. Records indicate that her symptoms are fairly well controlled with treatment. She does not have evidence of loss of strength, muscle mass, movement, reflexes or sensation to indicate significant impairment in her ability to function. Ms. Corry's subjective complaints of fatigue have been attributed by Dr. Gray as being due to Chronic Fatigue Syndrome. The classification of Chronic Fatigue Syndrome cannot be made for Ms. Corry as records indicate several existing conditions that may account for these complaints of fatigue, as noted by Dr. Brown in her opinion dated 04/02/01, including sinusitis, depression, mild anemia and deconditioning. Ms. Corry's complaints of fatigue are numerous and reported on many occasions to be the primary reason for her inability to function. However, the cause of this fatigue is not well documented, nor is there evidence such as muscle atrophy, disheveled appearance or other objective reports of inability to perform self-care.

(Footnotes omitted). Even though the physicians declined to offer an opinion as to whether her subjective complaints rendered her disabled, they concluded that there was no medical evidence to establish that she was disabled.

Thus, Liberty and its consulting physicians considered, evaluated, and addressed Corry's subjective complaints. The district court concluded, and Corry argues, however, that Corry's subjective complaints are entitled to more weight than the administrator gave them. But the job of weighing valid, conflicting professional medical opinions is not the job of the courts; that job has been given to the administrators of ERISA plans. See Gothard v. Metropolitan Life Ins. Co., No. 06-50386 (consolidated with No. 06-50564), 2007 WL 1830736, at *3 (5th Cir. June 27, 2007) ("[P]lan fiduciaries are allowed to adopt one of two competing medical views, a rule which resolves this appeal in favor of [the administrator]. ... [The administrator's] decision may not be correct, but we cannot say that it was arbitrary."). We only review for abuse of this discretion that has been given to the administrator. Vega, 188 F.3d at 295. Here, the administrator, and the medical experts upon which it relied, understood and accepted the diagnosis of fibromyalgia; and they considered the subjective evidence Corry offered. It is true that the administrator did not accept the opinion of Corry's experts as to the disabling effects of her symptoms. However, given the three qualified medical experts who found no objective medical evidence of disability, the administrator, under the established standard of review that restricts the courts, was not obliged to accept the opinion of Corry's physicians. In this "battle of the experts" the administrator is vested with discretion to choose one side over the other. See Gothard, 2007 WL 1830736, at *3. In sum, the claim that the administrator was arbitrary and capricious in failing to consider and give proper weight to relevant evidence must be rejected.

B.

Accordingly, we now turn to consider whether, in the light of all of the evidence relating to Corry's disability, substantial evidence supports Liberty's determination that Corry can perform full-time sedentary work. The district court did not specifically address this question because it concluded that

Liberty's denial of disability was arbitrary and capricious on grounds that it failed properly to consider and thus to give proper weight to Corry's subjective evidence of disability.

On appeal, Corry does not argue that the consulting physicians' opinions, which found no objective medical evidence of disability, are inadmissible expert testimony; Corry only argues that the opinions are inadequate to establish a finding of no disability because they effectively disregard her subjective pain and resulting disability and should therefore be discounted accordingly. We have already addressed this point.

Liberty argues that the medical opinions of the three consulting physicians constitute substantial evidence in support of Liberty's decision. These physicians, after reviewing all of the evidence of Corry's symptoms, had the following bottom-line conclusions. Dr. Chase, a rheumatologist, concluded: "No objective evidence was uncovered during this examination or review of records that would result in a finding of total disability." Dr. Brown, who specializes in physical medicine and rehabilitation, summarized: "The claimant's reported total disability is not substantiated by the objective medical documentation." Dr. Porges, a rheumatologist, reported: "Ms. Corry has a history of significant impingement of the right shoulder, which would not prevent full time sedentary employment; however, it may limit reaching with her arm while performing sedentary duties. No other objective evidence of a significant musculoskeletal disorder has been provided, aside from Ms. Corry's subjective complaints of chronic, diffuse pain."

It seems indisputable that the medical opinions of Liberty's three consulting physicians, each of whom are specialists and qualified experts in fields specifically related to Corry's symptoms, constitute substantial evidence supporting Liberty's determination that Corry has no disability that would preclude her from performing sedentary work. See Ellis, 394 F.3d at 273. We

might well assume, as the district court essentially did, that the totality of Corry's subjective complaints could suffice to establish substantial evidence of disability; nevertheless, "[t]he law requires only that substantial evidence support a plan fiduciary's decisions, including those to deny or to terminate benefits, not that substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability." See id. Only recently have we once again emphasized that an administrator does not abuse its discretion by relying on the medical opinions of its consulting physicians instead of the medical opinions of a claimant's treating physicians. See Gothard, 2007 WL 1830736, at *3 (citing Gooden v. Provident Life & Accident Ins. Co., 250 F.3d 329, 335 n.9 (5th Cir. 2001); MediTrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d 211, 213 (5th Cir. 1999); Sweatman v. Commercial Union Ins. Co., 39 F.3d 594, 597 (5th Cir. 1994)); see also Vercher v. Alexander & Alexander Inc., 379 F.3d 222, 233 (5th Cir. 2004). Accordingly, the opinions of the three consulting physicians constitute substantial evidence in support of Liberty's determination that Corry has no disability that precludes full-time sedentary work. See Ellis, 394 F.3d at 273.

## VI.

We sum up. Looking at the case as a whole, the record shows that Liberty considered Corry's claim of disability related to fibromyalgia thoroughly for several years while continuing to pay her benefits. On November 3, 1998, Corry's initial 36-month disability period ended and she became subject to the Policy's heightened definition of "disability." Thereafter, Liberty began to reevaluate Corry's condition to determine whether she met the Policy's standard of disability. On March 30, 1999, Liberty sent Dr. Norris a questionnaire regarding Corry's condition, inquiring as to supporting objective medical evidence and her subjective symptoms, such as severe fatigue, confusion, malaise, depression, and weakness. In February 2000, Liberty retained Dr.

21

Chase to examine Corry and her medical file, which reflected the examinations, reports, and opinions of other physicians. In March 2000, on the advice of Dr. Chase, Liberty scheduled a functional capacity examination of Corry, but Corry refused to undergo the examination on the advice of her physician, Dr. Norris. Liberty continued to evaluate her claims and sent an additional questionnaire to Dr. Norris in November 2000. Furthermore, Liberty asked another physician, Dr. Brown, to review Corry's medical file in April 2001. On the advice of Dr. Brown, Liberty scheduled Corry for an independent neuropsychological examination to take place June 14, 2001. Corry refused to attend the exam, and when Liberty rescheduled the exam for July 10, Corry again refused to attend on the advice of her physicians. It was only at this point that Liberty terminated Corry's benefits; still, Liberty continued its investigation and asked Dr. Porges to review Corry's medical file. Liberty then used the results of Dr. Porges' report to conduct a labor market study regarding the availability of sedentary jobs fitting Corry's experience and qualifications.

Ultimately, then, Liberty investigated and evaluated Corry's claim for over two and a half years, and obtained three specialists to review all of the evidence, one of whom additionally conducted an examination of Corry. As we have set out above, the record shows that Liberty and its physicians considered the evidence of disability submitted by Corry, including her subjective complaints of pain and disability, and that Liberty based its decision on substantial evidence of the medical opinions of three well-qualified specialists clearly stating that there was no verifiable objective medical evidence to support Corry's claim of disability. We therefore can only conclude that Liberty did not abuse its discretion, and that the basis for its termination of Corry's benefits is supported by substantial evidence.

VII.

For the foregoing reasons, we REVERSE summary judgment in favor of Corry, RENDER judgment in favor of Liberty, and REMAND for entry of judgment.

REVERSED; RENDERED; REMANDED.