IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 22, 2008

Charles R. Fulbruge III
Clerk

No. 07-31130

PEGGY YOUNG,

Plaintiff–Appellee,

v.

WAL-MART STORES, INC.; AMERICAN GENERAL LIFE COMPANIES,

Defendants–Appellants.

Appeal from the United States District Court
for the Middle District of Louisiana

Before REAVLEY, STEWART, and OWEN, Circuit Judges.

PER CURIAM:[*]

Peggy Young filed an application for accidental death benefits under a plan subject to the Employment Retirement Income Security Act (ERISA).[1] American International Life Assurance Company of New York (AI Life),[2] had issued a policy insuring the accidental death benefits provided by the plan, and AI Life denied the claim, concluding that the death of Young's husband was not

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] 29 U.S.C. §§ 1001 et seq.

[2] AI Life was misnamed "American General Life Companies" in Young's petition in the district court.

accidental. Pursuant to the parties' agreement, the district court resolved the dispute based on trial memoranda, concluding that AI Life had arbitrarily and capriciously denied benefits. The district court awarded full policy benefits of $25,000, attorney's fees, and costs. Because AI Life did not abuse its discretion in denying benefits, we reverse and render judgment.

I

Wal-Mart established an Employee Welfare Benefit Plan, and AIG Life Insurance Companies insured the Plan's benefits. AI Life, an AIG affiliate, issued a Dependent Life and Accidental Death and Dismemberment Policy to insure death or dismemberment benefits for certain dependents of covered Wal-Mart employees. Peggy Young was a covered employee, and her husband Earl Young was a dependent.

The AI Life policy provides for "accidental death" benefits if "[i]njury to an [i]nsured [d]ependent" results in the dependent's death. In the policy, "'Injury' means bodily injury caused by an accident occurring while the Policy is in force with respect to the person whose injury is the basis of the claim and results directly and independently of all other causes in a covered loss." The policy expressly excludes benefits for "any loss caused in whole or in part by, or resulting in whole or in part from . . . sickness, disease or infections of any kind." "Sickness" is defined as "illness or disease diagnosed by a Physician."

Earl Young suffered from hypertension with a history of vomiting, choking, and becoming unconscious. Approximately ten days before his death, Earl Young stopped taking his hypertension medication. A week later, he said he did not feel well, vomited, and became unconscious. He was taken by ambulance to River West Medical Center. Dr. Mark Portacci, Earl Young's treating physician, noted upon admission that "patient has severe hypertension and stopped taking his medication over one week ago. Upon having a vomiting

spell, then passing out, the ambulance was called. By the time he got to the ER, the patient was having what could have been seizure activity and then became comatose and unresponsive to pain requiring intubation and ventilation." Dr. Portacci initially assessed his condition to include "[h]ypertensive emergency: Hypertension with history of noncompliance and is currently status epilepticus." A chest X-ray indicated that Earl Young suffered from, among other things, pulmonary venous hypertension.

After showing no signs of improvement, Earl Young's ventilator was withdrawn, and he expired. On the River West Discharge Summary, Dr. Portacci listed the cause of death as "[c]hoking resulting in syncope and vomiting and possible aspiration with severe hypertension and anoxic brain injury." However, on the death certificate, Dr. Portacci stated the cause of death to be "[r]espiratory arrest[;] choking—Foreign body aspirated into trachea[;] anoxic brain injury," without mentioning hypertension. Dr. Portacci also described the death as an "Accident" for the first time on the death certificate.

Following her husband's death, Peggy Young filed an application for accidental death benefits under the Plan. AI Life then consulted Dr. James Lewis, a forensic pathologist with the International Institute of Forensic Science, and requested an independent evaluation and opinion. In his report, Dr. Lewis summarized the River West medical records followed by a series of questions and answers:

Q. In your opinion what was the cause of death?
A. In my opinion the cause of death is uncontrolled hypertension and complication thereof.

Q. In your opinion what was the manner of death?
A. In my opinion the manner of death is natural.

Q. In your opinion was the decedent's death due: to an accident clear and free of any [and] all illness or disease states?

A.      No, in my opinion the decedent suffered with severe uncontrolled Chronic Hypertension which resulted in his death.

Q.      In your opinion were there any illness [sic] or diseases that played a significant or major role in his death?

A.      Yes, the decedent suffered with severe uncontrolled hypertension and was non-compliant with his anti hypertensive medications for 1 week.

AI Life denied Young's application stating that it relied on "the facts and circumstances surrounding the insured's death," including its review of medical records from River West. AI Life's denial letter did not mention Dr. Lewis's report, although, as the district court noted, a copy of that report is included in the administrative record. Young appealed the decision, during which time Dr. Portacci submitted a one-paragraph letter stating that Earl Young's death was "caused by an accidental choking . . . . Therefore, it was an accidental death." AI Life affirmed its decision to deny benefits.

Peggy Young filed suit in the 18th Judicial District Court for the Parish of Iberville, Louisiana, and Wal-Mart and AI Life removed to federal district court. After the parties agreed to submit the case for "trial" on briefs only, the district court held that AI Life had arbitrarily and capriciously denied death benefits to Young and awarded policy benefits of $25,000, as well as $8,333.33 in attorney's fees. The district court reasoned that AI Life abused its discretion in relying on Dr. Lewis's report because "[h]is findings failed to establish a causal connection between Young's controlled or uncontrolled hypertension and his choking[,]" and "fail[ed] to demonstrate a causal connection, through medical evidence outside of Mr. Young's medical records, between either controlled or uncontrolled hypertension and vomiting or choking." Wal-Mart and AI Life now appeal.

## I I

ERISA provides federal courts with jurisdiction to review benefit determinations by fiduciaries or plan administrators.[3] Consistent with established principles of trust law, courts review de novo a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.[4] When a plan grants "the administrator or fiduciary discretionary authority to determine eligibility for benefits, . . . [t]rust principles make a deferential standard of review appropriate,"[5] and a court reviews an administrator's denial of ERISA benefits for abuse of discretion.[6] We review de novo the district court's determination of whether the administrator abused its discretion in denying benefits.[7]

When, as here, the insurer of plan benefits also determines eligibility for benefits, a conflict of interest exists.[8] As the Supreme Court recently explained in Metropolitan Life Insurance Co. v. Glenn, "[t]rust law continues to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or

---

[3] See 29 U.S.C. § 1132(a)(1)(B).

[4] See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

[5] Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2348 (2008) (quoting Firestone, 489 U.S. at 115, 111).

[6] Corry v. Liberty Life Assurance Co. of Boston, 499 F.3d 389, 397 (5th Cir. 2007) (quoting Vega v. Nat'l Life Ins. Serv., Inc., 188 F.3d 287, 295 (5th Cir. 1999) (en banc)).

[7] Lain v. UNUM Life Ins. Co. of Am., 279 F.3d 337, 343 (5th Cir. 2002) (citation omitted).

[8] See Glenn, 128 S. Ct. at 2348.

procedurally, has abused his discretion."[9] "[C]onflicts are but one factor among many that a reviewing judge must take into account."[10] Judges will often "tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together."[11] "In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance."[12]

The Supreme Court further explained in Glenn that an administrator's conflict of interest arising from its role in determining eligibility "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration."[13] Conversely, the conflict

> should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision-making irrespective of whom the inaccuracy benefits.[14]

In Glenn, the Supreme Court found "nothing improper" in the Sixth Circuit's review in which that court had observed that the insurance company "had emphasized a certain medical report that favored denial of benefits, had deemphasized certain other reports that suggested a contrary conclusion, and

---

[9] Id. at 2350.

[10] Id. at 2351.

[11] Id.

[12] Id.

[13] Id.

[14] Id.

had failed to provide its independent vocational and medical experts with all of the relevant evidence."[15]

In the present case, there is no evidence that AI Life has a history of biased claims administration. Nor is there any evidence that AI Life failed to provide its independent expert with all relevant evidence. On the other hand, there is no evidence that AI Life has "wall[ed] off claims administrators from those interested in firm finances."[16] AI Life did not emphasize any report over another, but its decision to deny benefits reflects that it did not accept an opinion expressed by Earl Young's treating physician. We nevertheless conclude that on balance, based on the record as a whole, the conflict of interest factor is not of great importance.

The Supreme Court observed "that Firestone means what the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one."[17] The Court analogized review of an ERISA plan administrator's denial of benefits to the standards of review applied in trust and administrative law, noting "judges . . . determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together,"[18] citing its decisions in Citizens to Preserve Overton Park, Inc. v. Volpe,[19] and Universal Camera Corp. v. NLRB.[20] In Citizens to Preserve Overton

---

[15] Id. at 2352.

[16] Id. at 2351.

[17] Id.

[18] Id.

[19] 401 U.S. 402, 415-17 (1971).

[20] 340 U.S. 474 (1951).

Park, the Secretary of Transportation authorized construction of an interstate highway through a public park.[21]  The Supreme Court observed:

> Both the Department of Transportation Act and the Federal-Aid to Highway Act provide that the Secretary 'shall not approve any program or project' that requires the use of any public parkland "unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park . . . ."  This language is a plain and explicit bar to the use of federal funds for construction of highways through parks—only the most unusual situations are exempted.[22]

The Court then held that the standard for reviewing the Secretary's decision was governed by the Administrative Procedure Act, 5 U.S.C. § 706.[23]  The Court held that neither the substantial evidence nor the de novo standards of review applied, but that "the generally applicable standards of § 706 require the reviewing court to engage in a substantial inquiry."[24]  If the Secretary acted within his or her authority, "[s]crutiny of the facts . . . requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"[25]  Reviewing courts "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.  Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow

---

[21] 401 U.S. at 406.

[22] Id. at 411 (citing 23 U.S.C. § 138 (Supp. V 1964); 49 U.S.C. § 1653(f) (Supp. V. 1964)).

[23] Id. at 413.

[24] Id. 415.

[25] Id. at 416 (quoting 5 U.S.C. § 706(2)(A) (Supp. V 1964)).

one."[26]  An appellate court is "not empowered to substitute its judgment for that of the agency."[27]

In the Universal Camera Corp. decision,[28] cited as another guidepost in Glenn,[29] the Supreme Court examined the phrase "unsupported by substantial evidence" in the Administrative Procedure Act,[30] and the phrase "if supported by substantial evidence on the record considered as a whole" in the Taft-Hartley Act.[31]  The Court held, "It would be mischievous wordplaying to find that the scope of review under the Taft-Hartley Act is any different from that under the Administrative Procedure Act,"[32]  The Court proceeded to explain how reviewing courts are to conduct a substantial evidence review.[33]

---

[26] Id.

[27] Id.

[28] 340 U.S. 474 (1951).

[29] Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2351 (2008).

[30] 340 U.S. at 482, n.15 (citing former 5 U.S.C. § 1009(e)).

[31] Id. at 485 (referring to 29 U.S.C. § 160(e)).

[32] Id. at 487.

[33] Id. 488-90.  The Court said:

> To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence.  Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect.  Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.  Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record

Although it is not entirely clear from the Supreme Court's decision in Metropolitan Life Insurance Co. v. Glenn whether a "substantial evidence" determination is included in our review to determine if AI Life abused its discretion, we conclude, for the reasons that follow, that AI Life's decision is supported by substantial evidence, and that based on the record as a whole, the decision was not arbitrary, capricious, or an abuse of discretion.

## III

The decision to deny benefits finds support in the record. The hospital admissions records indicate that the treating physician, Dr. Portacci, described Earl Young's "Present Illness" as severe hypertension with a "Past Medical History" of hypertension. Dr. Portacci later noted that Earl Young arrived at the emergency room in hypertensive emergency and the subsequent chest x-ray showed, among other things, "pulmonary venous hypertension." Further, Dr. Portacci noted in the treatment records that Earl Young had a "clear" history of vomiting, choking, and syncope—the same conditions leading to his death.

After reviewing the River West medical records, Dr. Lewis, the forensic pathologist consulted by AI Life, concluded that the cause of death was

---

in its entirety furnishes, including the body of evidence opposed to the Board's view.

. . . .

. . . Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

"uncontrolled hypertension and complication thereof." Rather than an accident that was not the result "in whole or in part from . . . sickness, disease or infection of any kind," Dr. Lewis opined that Earl Young "suffered with severe uncontrolled Chronic Hypertension which resulted in his death."

Despite the evidence in the medical records, Young argues that the plan administrator abused its discretion in relying on Dr. Lewis's report because the report failed to establish a causal connection between her husband's hypertension and his choking. However, when asked "were there any illness [sic] or diseases that played a significant or major role in his death," Dr. Lewis specifically stated "[y]es, the decedent suffered with severe uncontrolled hypertension and was non-compliant with his anti hypertensive medications for 1 week." Young also focuses on whether hypertension was the cause of her husband's choking, rather than whether his choking was "an accident" that "result[ed] directly and independently of all other causes." The medical records reflect that Earl Young described what was happening to him before he became unconscious, saying "that he did not feel good" and that he then vomited and passed out. This does not indicate that he suddenly choked on a foreign object, as his physician opined only after Earl Young's death. In light of Earl Young's history of choking and vomiting followed by unconsciousness, his history of "noncompliance" in managing his hypertension, and the admission records, it was reasonable to conclude that his death was "caused in whole or in part by, or result[ed] in whole or in part from . . . sickness [or] disease . . . of any kind."

Young also contends that AI Life abused its discretion when it chose to rely on a medical consultant rather than the treating physician. The Supreme Court has made clear that while "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," reviewing "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician;

nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."[34] In the present case, as discussed above, there was credible evidence that conflicted with the treating physician's evaluation, including credible evidence from the treating physician's own records regarding the symptoms—vomiting, choking, and syncope—Earl Young had a history of displaying. Courts cannot second guess the weight that AI Life gave to the treating physician's and the independent expert's respective opinions. "[T]he job of weighing valid, conflicting professional medical opinions is not the job of the courts; that job has been given to the administrators of ERISA plans."[35]

The administrative record contained substantial evidence, "even if disputable," that supports the plan administrator's denial of benefits.[36] Based on that evidence, and taking into consideration the minimal conflict of interest, AI Life did not abuse its discretion in denying benefits.

---

[34] Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003); see also Gooden v. Provident Life & Accident Ins. Co., 250 F.3d 329, 335 n.9 (5th Cir. 2001) (holding that an administrator who relies on a consulting physician's opinion rather than the treating physician's does not abuse its discretion); cf. Gothard v. Metro. Life Ins. Co., 491 F.3d 246, 249 (5th Cir. 2007) (finding no abuse of discretion "even if the consulting physician only reviews medical records and never physically examines the claimant, taxing to credibility though it may be.").

[35] Corry v. Liberty Life Assurance Co. of Boston, 499 F.3d 389, 401 (5th Cir. 2007) (citing Gothard, 491 F.3d at 249-50).

[36] Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 299 (5th Cir. 1999) (en banc).

IV

The district court had discretion to award reasonable attorney's fees and court costs under 29 U.S.C. § 1132(g)(1), including to the non-prevailing party. "Such an award is purely discretionary, and we review the district court's decision only for an abuse of discretion."[37] Wal-Mart and AI Life argue that the district court's award of attorney's fees to Young was an abuse of discretion.

In an ERISA case, the district court applies the five factors enumerated in Iron Workers Local No. 272 v. Bowen,[38] to determine whether the party is entitled to attorney's fees.[39] Those factors are: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the party requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.[40]

Under the first factor, the degree of culpability or bad faith, the district court found that AI Life acted in bad faith because it failed to adequately explain the reasons for its denial and the medical records failed to support the plan administrator's decision to deny benefits. However, the plan administrator's decision was supported by the medical records,[41] and the plan administrator did

---

[37] Salley v. E.I. DuPont de Nemours & Co., 966 F.2d 1011, 1016-17 (5th Cir. 1992) (citing Donovan v. Cunningham, 716 F.2d 1455, 1475 (5th Cir. 1983)).

[38] 624 F.2d 1255, 1266 (5th Cir. 1980).

[39] Id.

[40] Id.

[41] See supra III.

not make its decision in bad faith and was not culpable. Accordingly, the first factor weighs against the award of attorney's fees.

As to the second factor, we agree with the district court that there is no indication that AI Life is incapable of satisfying an award of reasonable attorney's fees. Therefore, this factor supports the award of attorney's fees.

With regard to the third Bowen factor, the district court found that an award of attorney's fees may encourage other insurers to exercise greater care when reviewing claims for benefits. However, the district court based its finding on the belief that the plan administrator abused its discretion in denying benefits to Young. Because the administrator did not abuse its discretion, awarding attorney's fees would not encourage other insurers to exercise greater care when reviewing claims for benefits. Instead, awarding attorney's fees to Young would encourage claimants with non-meritorious claims to contest the denial of benefits in a court of law. The third factor weighs against the award of attorney's fees.

The district court found the fourth factor, whether the party requesting attorney's fees sought to benefit all participants of an ERISA plan or resolve a significant question regarding ERISA, to not be a significant consideration. Young admits that requesting attorney's fees does not raise nor resolve a significant legal question regarding ERISA. Nor does Young seek attorney's fees for the benefit of all plan participants. Accordingly, the fourth factor weighs against awarding attorney's fees.

Finally, the district court determined that the fifth factor, the relative merits of the parties' positions, favored an award of attorney's fees because AI Life lacked factual or evidentiary support. The substantial evidence in the administrative record supports the plan administrator's decision. Therefore, the fifth factor also weighs against awarding attorney's fees.

Because four of the five Bowen factors weigh against awarding attorney's fees, and the only factor weighing in favor is the defendant's ability to pay, we conclude that the district court abused its discretion.

\*　　　\*　　　\*

For the foregoing reasons, we REVERSE and RENDER judgment that the plaintiff take nothing.