# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-10895

LASHONDRA DAVIS,

Plaintiff - Appellant

v.

AETNA LIFE INSURANCE COMPANY,

Defendant - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

June 14, 2017

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:15-CV-1654

Before WIENER, DENNIS, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Lashondra Davis appeals the district court's grant of summary judgment in favor of Aetna Life Insurance Company. The district court held that Aetna did not abuse its discretion under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B), in denying Davis long-term disability (LTD) benefits. We agree with the district court that Aetna's

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-10895

decision to terminate Davis's benefits did not constitute an abuse of discretion and therefore AFFIRM.

I

Between October 2005 and April 2010, Davis worked at Experian Information Systems, Inc. as a customer support associate. While she worked at Experian, Davis was enrolled in the Experian Long-Term Disability Plan (Plan). On April 21, 2010, Davis, who was thirty-four years old at the time, stopped working full-time at Experian due to health issues. Davis's rheumatologist and treating physician, Dr. Don E. Cheatum, diagnosed her with, inter alia, systemic lupus erythematosus (lupus), fatigue, and morning stiffness. Davis applied initially for short-term disability (STD) and then, when her condition did not improve, for LTD benefits under the Plan.

Aetna, the Plan's underwriter and claims administrator, approved STD benefits to Davis based on Dr. Cheatum's diagnosis beginning April 23, 2010. In support of Davis's claim, Dr. Cheatum provided Aetna with Attending Physician Statements (APSs), starting in May 2010 and lasting throughout the benefits period. The APSs described Davis's diagnoses, limitations, and abilities, and summarized her treatment and medications. All of Davis's APSs stated that she had "severe pain" and "fatigue" and that she was "chronically [and] permanently disabled." During this period, Dr. Cheatum also submitted Capabilities and Limitations Worksheets (Worksheets) stating that Davis could never climb, crawl, kneel, pull, push, reach forward or above her shoulder, carry, bend, twist, use her hands for fine or gross manipulation or repetitive motions, and that Davis could not sit, stand, or walk for "prolonged" periods.

To determine Davis's continued eligibility for STD benefits, in June 2010, Aetna asked Dr. Anne M. MacGuire, also a rheumatologist, to conduct a peer review of Davis's medical records and a peer-to-peer conversation with Dr.

Cheatum. Dr. MacGuire agreed with Dr. Cheatum that Davis was disabled due to the pain, fatigue, and cognitive impairment that resulted from her medical condition. Aetna paid Davis twenty-six weeks of STD benefits between April and October 2010. In September 2010, Aetna notified Davis that it was evaluating her eligibility for LTD benefits.

On October 20, 2010, Aetna advised Davis that she met the "own occupation" definition of disability, meaning that Davis was eligible to receive monthly LTD benefits for twenty-four months because she was unable to perform the material duties of her own occupation. Aetna paid LTD benefits to Davis through the entire own-occupation period. During this period, Aetna received additional progress notes, APSs, Worksheets, and laboratory results regarding Davis's medical condition.

In July 2012, Aetna was notified that an Administrative Law Judge (ALJ) had recently denied Davis's claim for Social Security Disability Insurance (SSDI). The ALJ had found that the evidence "did not demonstrate the requisite degree of joint, muscle, ocular, respiratory, cardiovascular, digestive, renal, hematologic, skin, neurological, mental involvement or the involvement of two or more organs/body symptoms with significant, documented, constitutional symptoms and signs of severe fatigue, fever, malaise and weight loss." The ALJ also found that "[i]n activities of daily living and social function, the claimant has mild restriction," and "[w]ith regard to concentration, persistence or pace, the claimant has mild difficulties." The ALJ stated that "the medically determinable impairments cannot reasonably be expected to produce the symptoms to the degree alleged," and that Davis's "statements concerning the intensity, persistence and limiting effects of these symptoms are not found credible to the extent that they are outside the range of medically reasonable attribution."

3

No. 16-10895

After the first twenty-four months of LTD benefits, in contrast to the own occupation period, Davis's Plan provided for payment only if Davis was "not able, solely because of injury or disease, to work at any reasonable occupation." The Plan gave Aetna "the discretionary authority to determine whether and to what extent employees and beneficiaries are entitled to benefits and construe any disputed or doubtful terms of this policy."

In May 2012, as part of Aetna's assessment of Davis's continued eligibility for LTD benefits, a nurse performed a clinical review of Davis's claim and concluded that the documentation regarding her functional impairment was inconsistent with Dr. Cheatum's APSs stating that she was permanently disabled. The nurse found that there was inconsistent documentation as to her morning stiffness, that she had shown no synovitis (inflammation in the joints), and that her mental status examinations were not documented. The nurse recommended that Davis undergo an Independent Medical Examination (IME).

In November 2012, Dr. Charles R. Crane, board certified in physical medicine and rehabilitation, conducted the IME. Dr. Crane's findings were consistent with those of Dr. Cheatum: Davis was able to do sedentary and light type activities, but only for brief periods of time. Due to the fatigue associated with her lupus and rheumatoid arthritis, Davis could not sustain prolonged periods of active work without having to take a break for rest and recovery. Based on Dr. Crane's report, Aetna approved Davis's LTD benefits under the "any reasonable occupation" standard and advised her that Aetna would periodically reevaluate her eligibility. In January 2013, a claims examiner conducted a telephone interview with Davis regarding her medical condition and daily activities. Davis reported that she did not drive and continued to suffer from severe fatigue, stiffness, and joint pain. Davis said that she could type and do laundry, and on good days she could go out and do some shopping,

4

No. 16-10895

but that going to a place like Wal-Mart would be "overdoing it."  Quarterly lab tests from July 2012 and August 2013 showed that Davis exhibited inflammation, lupus, and rheumatoid arthritis.

In late 2013, Aetna referred Davis's claim to its risk management unit. Aetna conducted a public records search on Davis.  Aetna also obtained video surveillance of Davis's activities over a twenty-two minute period on December 31, 2013, and over a one-hour-and-forty-seven-minute period on January 3, 2014.  Davis was observed driving to three fast-food restaurants and a pharmacy, turning her body, bending down, leaning forward, reaching into the back seat of her car, carrying a bag over her shoulder, and walking quickly.

Aetna also performed a social media search of Davis and her husband. Davis's LinkedIn account confirmed that she was a student at Northcentral University, although Aetna never confirmed whether Davis was actually attending class.  Her husband's Facebook account reported that Davis visited several restaurants, a movie theater, and a bowling alley during four days in July and August of 2013.  His social media account also indicated that they visited various tourist attractions in San Antonio, Texas, during this period, although there are no pictures of either Davis or her husband at these places.

In February 2014, Aetna asked Dr. Joseph L. Braun, an occupational medicine specialist, to perform a peer review of Davis's medical file.  Dr. Braun reviewed Dr. Cheatum's office notes from November 2008 to November 2013, the video surveillance, and the background records check.  Dr. Braun also spoke with Dr. Cheatum.  During the conversation, Dr. Cheatum advised Dr. Braun there were no recent changes in Davis's medication or condition, that her cognitive problems were caused by lupus, and that she could not do any work, even sedentary, because of her fatigue, weakness, pain, and cognitive problems.

5

No. 16-10895

Dr. Braun disagreed with Dr. Cheatum, and concluded that "the evidence presented [did] not support any level of restriction/limitation resulting in impairment." He said that the surveillance footage demonstrated that Davis's activities were "consistent with at least a sedentary [physical demand level] occupation capacity," and that Davis was capable of performing in such capacity. In early March 2014, Aetna forwarded Dr. Braun's report to Dr. Cheatum and Davis for review and comment. Aetna did not receive a response.

On March 27, 2014, Aetna informed Davis that she no longer qualified for LTD benefits, which required her to be unable to work in any occupation. Aetna advised Davis that it reached its decision after considering Dr. Cheatum's medical records, Davis's self-reporting, the IME performed by Dr. Crane, the surveillance and social media investigation, and Dr. Braun's peer review. It explained that:

> Taken together, the clinical evidence in the claim file in conjunction with your demonstrated functional capabilities fails to support restrictions or limitations, physical or cognitive, that would preclude you from sitting up to 8 hours a day, with the ability to change positons as necessary and lifting up to ten pounds occasionally. This level of functionality is consistent with the requirements of your own occupation as a Customer Support Associate.

Davis wrote to Aetna to appeal its decision. Dr. Cheatum sent Aetna additional medical records reiterating his previous findings. He provided a letter to Aetna stating that Davis's lupus was "rather severe," but that she did not need to see a psychologist, psychiatrist, or neurologist for her cognitive problems. Dr. Cheatum also provided his responses to a Social Security Administration questionnaire that stated that "none of Davis's symptoms or limitations, in [his] expert opinion, are inappropriate or excessive," and that "with lupus . . . you have good days and bad days." Dr. Cheatum also provided

6

office visit notes from April and May 2014, in which he noted Davis was still suffering from severe fatigue and morning stiffness, and her lab test results, which indicated that Davis still exhibited inflammation consistent with his diagnosis of lupus and rheumatoid arthritis.

In July 2014, Aetna asked Dr. Siva Ayyar, an occupational medical specialist, to conduct another peer review. Dr. Ayyar reviewed Dr. Cheatum's office notes, APSs, laboratory results, Dr. MacGuire's 2010 peer review, work history questionnaires, 2011–2012 Worksheets, Davis's unfavorable SSDI decision, the 2012 IME report, her social media profile, the surveillance report, and video. Dr. Ayyar also attempted to conduct a peer-to-peer conference with Dr. Cheatum but was unable to reach him.

Dr. Ayyar concluded "while [Davis] may carry a diagnosis of [lupus], there is no evidence that this issue is generating the need for any continuous medically necessary limitations and/or restrictions . . . ." Dr. Ayyar noted that the "surveillance video and report suggest that the claimant is, in fact, essentially unimpaired from neurologic and musculoskeletal perspectives," and while Davis may require temporary limitations when she experiences flares, "there is no evidence that the claimant is continuously symptomatic insofar as the lupus is concerned." Dr. Ayyar disagreed with Dr. Cheatum's diagnosis that Davis should be "deemed totally functionally impaired," stating that Davis is "independently ambulatory," and "exhibits and retains well-preserved ability, capability and functionality well in excess of her stated capacity and well in excess of her proclamation of inability to work from a medical perspective."

Aetna forwarded Dr. Ayyar's peer review to Dr. Cheatum for comment. In response, Dr. Cheatum provided a July 23, 2014, progress note. His note reiterated that Davis should be considered "chronically disabled," and that his opinion should "outweigh[] any other opinion the insurance carrier might wish

to bring forth." Dr. Cheatum stated that if the "insurance carrier doctor does not realize that this patient is disabled, then that doctor needs to go back to school."

After reviewing the progress note, Dr. Ayyar responded, noting that Dr. Cheatum's own progress note "suggested that [Davis] presented to the clinic in an essentially unimpaired manner . . . despite multifocal pain complaints and lowgrade swelling appreciated about the knees and wrists." Dr. Ayyar stated that while Davis may require temporary limitations when she suffers severe lupus flares, Davis had not demonstrated the need for any "specific biomechanical limitations or restrictions."

At Aetna's behest, Dr. Ayyar finally spoke with Dr. Cheatum who stated that he believed Davis's complaints of multifocal pain, fatigue, and malaise should result in her qualifying for long-term disability, and that he was inclined to discount the covert surveillance video on the grounds that these were filmed on some of the Davis's "good days." Dr. Ayyar responded that Davis's "previous behavior on covert surveillance suggest[s] that she is, in fact, essentially unimpaired from the neurologic and musculoskeletal perspectives and, moreover, argues against the need for the imposition of any continuous biomechanical limitations or restrictions."

Aetna upheld its prior decision to terminate Davis's LTD benefits based on insufficient medical evidence to support Davis's inability to perform any occupation. Aetna found that although Davis carried a diagnosis of lupus and might require temporary limitations associated with temporary flares, her medical condition did not require the imposition of continuous physical limitations or restrictions.

In May 2015, Davis filed suit against Aetna pursuant to 29 U.S.C. § 1132(a)(1)(B), in federal district court seeking past-due LTD benefits and to have her benefits reinstated. The parties filed cross motions for summary

judgment. The district court concluded that Aetna's decision to terminate LTD benefits was based on and supported by a complete and thorough review of the claim file which included medical records, multiple opinions from Davis's treating physician Dr. Cheatum, two different peer review physicians, an ALJ, video surveillance, social media investigation, and Davis's self-reporting during the relevant time.

The court determined that Aetna considered and addressed the various aspects of Davis's medical evidence—including Dr. Cheatum's records and opinions and Davis's self-reports of pain. The district court concluded that Aetna had presented substantial evidence to support its denial of LTD benefits under the "any reasonable occupation" standard. The court found the peer reviewers' reports to be reliable and that the public record search and video surveillance revealed a higher level of activity than either Davis or Dr. Cheatum had reported. The district court found that there was a rational connection between the medical evidence and Aetna's finding that Davis was not eligible for LTD.

The district court also considered the July 2012 decision by an ALJ denying Davis's claim for SSDI. The court found the ALJ's denial of Davis's request for SSDI highly relevant as to whether Aetna acted arbitrarily and capriciously. It also found significant that the ALJ had determined that Davis's self-reporting was not supported by the medical evidence and therefore was not credible.

The district court concluded that Aetna did not abuse its discretion in denying Davis's claim for LTD benefits. Although Aetna had a conflict of interest as both plan administrator and underwriter, the court found that Davis had not shown that the conflict impacted Aetna's decision to deny benefits in any significant way. Davis timely appealed.

No. 16-10895

II

We review "a district court judgment on cross-motions for summary judgment de novo." *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F. 3d 485, 488 (5th Cir. 2007). In this case, because the Plan gives the plan administrator the discretionary authority to construe the Plan's terms and to render benefit decisions, we will reverse Aetna's denial of benefits only if it abused its discretion. *See Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 397 (5th Cir. 2007) (citing *Vega v. Nat'l Life Ins. Serv., Inc.*, 188 F.3d 287, 295 (5th Cir. 1999) (en banc)). Under the abuse of discretion standard, the plan administrator's decision will prevail if it "is supported by substantial evidence and is not arbitrary and capricious." *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2005). This court has defined "substantial evidence" as "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* "(quoting *Deters v. Sec'y of Health, Educ. & Welfare*, 789 F.2d 1181, 1185 (5th Cir. 1986)). "An arbitrary decision," by contrast, "is one made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Corry*, 499 F.3d at 398 (internal quotation marks and citation omitted). Our "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even if on the low end." *Id.* (internal quotation marks omitted).

In determining whether there was an abuse of discretion, we also consider whether the plan administrator had a conflict of interest. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). A plan administrator has a conflict of interest if it "both evaluates claims for benefits and pays benefits claims." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105,

No. 16-10895

112 (2008). However, a conflict of interest is "but one factor among many that a reviewing judge must take into account." *Id.* at 116. "[A] conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision." *Id.* at 117. "[A] reviewing court may give more weight to a conflict of interest[] where the circumstances surrounding the plan administrator's decision suggest 'procedural unreasonableness'"—that is, where the "method by which [the plan administrator] made the decision was unreasonable." *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d 465, 469–71 (5th Cir. 2010) (quoting *Glenn*, 554 U.S. at 118).[1]

### III

Davis argues that Aetna's decision to terminate Davis's disability benefits was procedurally unreasonable in light of its structural conflict of interest. In support, Davis avers that Aetna gave greater weight to the opinions of its peer review physicians over her treating physician, Dr. Cheatum, and she alleges that Aetna failed to provide the peer review physicians with all of the relevant medical evidence. Davis further argues that Aetna abused its discretion by (1) relying on peer review physicians who were not properly qualified; (2) rejecting Davis's self-reporting regarding her

---

[1] Davis argues that because of Aetna's conflict of interest and the procedural unreasonableness by which it terminated her benefits, the district court should have accorded less deference to Aetna's decision. Davis's argument misapprehends applicable case law. While procedural unreasonableness is a factor that a court must consider in determining what weight to accord a plan administrator's conflict of interest, even where such evidence suggests that more weight should be given to a conflict, it has no effect on the standard of review. *See Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 247 n.3 (5th Cir. 2009) (explaining that the Supreme Court's decision in *Glenn* "directly repudiated the application of any form of heightened standard of review to claims denials in which a conflict of interest is present"). We will therefore review Aetna's decision to terminate Davis's benefits for an abuse of discretion.

11

condition; and (3) placing improper weight on the surveillance and social media investigation evidence.

A

Davis first asserts that Aetna, which has a structural conflict of interest in that it is both the administrator and insurer of the disability plan, acted in a procedurally unreasonable manner. "Procedural unreasonableness" means simply that the "method by which [the plan administrator] made the decision was unreasonable." *Schexnayder*, 600 F.3d at 469–71. In *Metropolitan Life Insurance Co. v. Glenn,* the Supreme Court considered a similar claim to that raised by Davis. The plan administrator had initially urged the claimant to argue to the Social Security Administration that she could not work, but then when it did its own review the plan administrator found that she could in fact perform sedentary work and was therefore ineligible for disability benefits. *See* 554 U.S. at 118. The Court observed that this "course of events . . . suggested procedural unreasonableness." *Id.* The Court added that the fact that the plan administrator relied on medical reports that favored the denial of benefits while ignoring reports that reached the opposite conclusion and failed to provide the medical experts with all of the evidence further demonstrated procedural unreasonableness. *Id.*

Davis alleges that, like the plaintiff in *Glenn*, Aetna's decision was procedurally unreasonable because Aetna also favored the medical reports that supported denying her benefits and also failed to give the peer review physicians all of the pertinent medical evidence. However, the similarities between this case and *Glenn* are only superficial. Unlike in *Glenn*, Aetna and the SSA reached the same conclusion that Davis was not entitled to benefits. Second, although the Supreme Court's decision does not go into much detail, the Sixth Circuit's lengthy discussion of the facts in *Glenn* shows that Davis's claim is readily distinguishable. Moreover, the Sixth Circuit found that in

denying the claimant's benefits, the plan administrator failed to explain why it had credited a "brief form" from the claimant's treating physician that stated she was capable of working in a sedentary position, but had ignored every single one of the treating physician's more detailed reports that reached the opposite conclusion. *Glenn v. MetLife*, 461 F.3d 660, 672 (6th Cir. 2006), *aff'd sub nom. Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). The Sixth Circuit also found that the plan administrator withheld from the peer review physician evidence from the claimant's treating physician that concluded the claimant could not return to work, but provided other evidence that supported the conclusion that the claimant could perform a sedentary job. *Id.* at 671–72, 674. On the basis of this evidence, the Sixth Circuit concluded that the plan administrator's decision "was not the product of a principled and deliberative reasoning process," and was therefore "arbitrary and capricious." *Id.* at 674.

Unlike the plan administrator in *Glenn*, Aetna did not ignore or mischaracterize the recommendations of Dr. Cheatum, or rely on medical reports that ignored his diagnosis and conclusions. Rather, Aetna placed greater weight on the conclusions of Drs. Braun and Ayyar, who, upon review of the relevant medical evidence, including Dr. Cheatum's notes, and after discussing their findings with Dr. Cheatum, disagreed with Dr. Cheatum's conclusions that Davis was permanently disabled. This is clearly permissible. *See, e.g.*, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (noting that while "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," ERISA does not require plan administrators to accord special deference to the opinions of a claimant's treating physicians); *Corry*, 499 F.3d at 401 (plan administrator did not abuse its discretion in crediting its consulting physicians over the claimant's treating physicians; this merely

constituted a "battle of the experts," where the administrator was "vested with [the] discretion to choose one side over the other").

Similarly, while Davis is correct that a plan administrator cannot pick and choose the evidence it provides to peer reviewers in an effort to obtain a favorable report that supports its desired outcome, that is not what Aetna did. In his report, Dr. Braun stated that he considered the following records: Dr. Cheatum's office notes from November 23, 2008 to November 8, 2013; the video surveillance; and the background records check. Dr. Braun also stated that he had conducted a peer-to-peer conversation with Dr. Cheatum. Aetna did not withhold contradictory evidence, and Davis does not explain how Aetna's failure to provide Dr. Braun with additional evidence affected his conclusions. Davis contends that Aetna should have provided Dr. MacGuire's report, but it was dated July 12, 2010, and did not concern Davis's eligibility for LTD. Dr. Braun stated in his report that he was aware of the IME and its conclusions, and he was indisputably aware of Dr. Cheatum's diagnosis and conclusions. Thus, the additional materials would likely not have had an effect on Dr. Braun's opinion.

Dr. Ayyar reviewed Davis's medical records from 2010 to 2014, including Dr. Cheatum's office notes, x-rays, the IME report, lab results, and the surveillance report and video. Like Dr. Braun, Dr. Ayyar agreed with Dr. Cheatum's conclusions that Davis suffered from lupus, but disagreed that the evidence showed a need for any continuous medically necessary limitations or restrictions. Although Dr. Ayyar did not review all of the Worksheets, the Worksheets simply restate Dr. Cheatum's diagnosis that Davis was completely disabled. Davis does not explain how Dr. Ayyar's conclusions would have differed had he been provided with the Worksheets.

In sum, the record does not reveal any evidence that would allow us to draw a reasonable inference that Aetna's structural conflict of interest may

have influenced its benefits decision. We therefore conclude that Aetna's structural conflict of interest itself need not be accorded particularly great weight when considering whether Aetna abused its discretion. *Cf. Glenn*, 554 U.S. at 117 (conflict of interest should prove more important where circumstances suggest that the conflict affected the benefits decision).

B

Davis next assails the evidence supporting Aetna's decision by challenging the qualifications of Drs. Braun and Ayyar, both occupational medicine specialists. Davis argues that neither of them are board certified in rheumatology, Dr. Cheatum's specialty. ERISA regulations require plan administrators to utilize peer reviewers that have "appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3). However, we have held that a plan administrator does not abuse its discretion merely by selecting a reviewing physician who does not have the exact same specialty as the claimant's treating physician. *See, e.g., Burtch v. Hartford Life & Accident Ins. Co.*, 314 F. App'x 750, 753 n.3 (5th Cir. 2009) (per curiam) (plan administrator did not abuse its discretion by selecting an internist with no specialized training in pulmonology to review the claimant's emphysema as a peer reviewer).[2]

As the district court noted, Aetna did not request review by a specialist from a completely unrelated field of medicine; both Drs. Braun and Ayyar, occupational medicine specialists, had the "appropriate training and experience in the field of medicine involved in the medical judgment." *See* 29 C.F.R. § 2560.503-1(h)(3). Davis does not explain how their qualifications rendered them unsuited to determine whether she was capable of working in

---

[2] Although *Burtch* is not "controlling precedent," it "may be [cited as] persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (citing 5TH CIR. R. 47.5.4).

"any reasonable occupation." We thus conclude that Aetna did not abuse its discretion in relying on their findings.

C

Davis also alleges that Aetna abused its discretion by ignoring and rejecting Davis's self-reports of pain, chronic fatigue, and short-term memory loss. Davis notes that Aetna's only comment regarding her subjective complaints in its denial letter was that she "claimed symptoms of fatigue, anemia, malaise . . . pain in multiple joint sites . . . cognitive and memory problems."

Plan administrators may not ignore consistent complaints of pain as subjective, but they are not required to give such complaints determinative weight. *See Corry*, 499 F.3d at 400–01. Nor do plan administrators need to explain why they credited evidence that contradicts a claimant's reported limitations. *See Nord*, 538 U.S. at 834.

Davis fails to show that that Aetna ignored or rejected Davis's complaints of pain or fatigue. Aetna relied on Drs. Braun and Ayyar, who considered Davis's reports of pain, fatigue, and short-term memory loss and yet reached the conclusion that the medical evidence did not support the conclusion that Davis was entitled to LTD benefits. Aetna did not abuse its discretion in determining that Drs. Braun's and Ayyar's conclusions, which took Davis's reports into account, deserved more weight than Davis's self-reporting.

D

Finally, Davis argues that the surveillance and social media investigation evidence do not disprove Dr. Cheatum's conclusions regarding Davis's limitations or refute Davis's self-reporting regarding her condition. Both Davis and Dr. Cheatum said that Davis had good days and bad days and that the surveillance and social media captured her activity level on good days.

Davis also argues that the surveillance captured Davis only driving and sitting in her car for brief periods and that this does not establish that she could sit for most of a work day or stand and walk on an occasional basis. She also argues that Aetna improperly placed special importance on the fact that Davis drove when she claimed she did not. Davis concedes that she drove, but emphasizes that Dr. Cheatum expressly noted in each of his Worksheets that Davis could drive. She asserts that her misstatement to Aetna was therefore inconsequential.

The surveillance footage and social media search were only part of the evidence that Aetna relied on to determine Davis's eligibility. Aetna also based its decision to terminate Davis's LTD benefits on its own review of Dr. Cheatum's medical records and opinions, the IME report, an ALJ's determination that Davis was ineligible for SSDI, Davis's self-reporting during the relevant time, and the conclusions of the two peer reviewers. The peer reviewers themselves reviewed Davis's medical records and also discussed Davis's condition with Dr. Cheatum. Both peer reviewers, and in turn Aetna, concluded that Davis possessed a level of functionality that would not prevent her from working eight hours a day in a sedentary position, although Aetna acknowledged that Davis may require temporary limitations or restrictions at times when she experiences flares due to her medical condition.

Moreover, Aetna relied on the surveillance footage not only as evidence to determine Davis's actual limitations, but also as evidence to determine whether Davis's self-reporting was credible. Aetna recognized that Davis would likely have good days and bad days; however, it concluded from the entirety of the evidence that Davis could work in a sedentary position with occasional limitations when she experienced flares from lupus.

We therefore conclude that Aetna's reliance on the surveillance and social media evidence did not constitute an abuse of discretion.

No. 16-10895

\*\*\*

While there is some evidence in the record to support Davis's claim for disability, there is substantial evidence supporting Aetna's decision to deny her LTD benefits. Given the deferential abuse of discretion standard of review, we are compelled to agree with the district court that Aetna did not abuse its discretion. For these reasons, the district court's judgment is AFFIRMED.